1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10   NICHOLAS COOK, individually and on                    CASE NO. C13-1836-RSM
     behalf of all others similarly situated,

11                                                          ORDER ON MOTIONS TO
                    Plaintiff,                              APPOINT LEAD PLAINTIFF

12

13          v.

14   ATOSSA GENETICS, INC., STEVEN C.
     QUAY, CHRISTOPHER BENJAMIN,

15   KYLE GUSE, SHU-CHIH CHEN, JOHN
     BARNHART, STEPHEN J. GALLI,

16   ALEXANDER CROSS, H. LAWRENCE
     REMMEL, DAWSON JAMES

17   SECURITIES, INC., VIEWTRADE
     SECURITIES, INC., and PAULSON

18   INVESTMENT COMPANY, INC.,

19                  Defendants.

20

21                                  **I. INTRODUCTION**

22          This matter comes before the Court on Movants Miko Levi, Bandar Almosa, and Gregory

23   Harrison's (collectively the "Levi Group") Motion for Appointment as Lead Plaintiff (Dkt. # 7),

24   and Movant Hai Dam's Motion for Appointment as Lead Plaintiff (Dkt. # 9). Movant David

Chobanian seeks to withdraw his motion for appointment in support of the Levi Group's motion. *See* Dkt. ## 3, 20. For the reasons that follow, the Court appoints the Levi Group as lead plaintiff, and the law firms of Block & Leviton LLP ("Block & Leviton") and Pomerantz Grossman Hufford Dahlstrom & Gross LLP ("Pomerantz") as co-lead counsel and the law firm of Zwerling, Schachter & Zwerling, LLP ("Zwerling Schacter") as liaison counsel.

## II. BACKGROUND

This is a federal securities class action brought against Atossa Genetics, Inc. ("Atossa"), several of its officers and directors, and the underwriters for Atossa's November 8, 2012 initial public offering ("IPO"). The Class Action Complaint ("CAC") alleges that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated by the Securities and Exchange Commission, and Sections 11, 12(a)(2) and 15 of the Securities Exchange Act of 1933 ("1933 Act"). The 1933 Act claims allege that Defendants made materially untrue statements in the Registration Statement and Prospectus used in connection with the IPO and the 1934 Act claims are based on materially false and misleading statements made by Atossa and the named officers and directors between November 8, 2012 and October 4, 2013 (the "Class Period"). *See* Dkt. # 1, ¶ 1. Named Plaintiff Nicholas Cook published the initial notice of pendency of class action required by the Private Securities Litigation Reform Act of 1995 on October 10, 2013. *See* Dkt. # 6, Makris Decl., Ex. A.

Atossa is a development-stage healthcare company that commercializes diagnostic risk assessment products for detecting pre-cancerous conditions that may lead to breast cancer.  Dkt. # 1, ¶ 2. Under certain circumstances, medical device manufacturers may bring products to market through compliance with the U.S. Food and Drug Administration's  ("FDA") Section 510(k) submission process of the Federal Food, Drug, and Cosmetic Act. The 510(k) submission

1 process allows the FDA to determine whether a medical device is new or significantly altered

2 such that the safety and effectiveness of the device may be affected. *Id.* at ¶ 3.

3       Atossa's flagship product came to market through this procedure. During the Class

4 Period, Atossa stated in its company prospectus, which was included in its SEC Form S-1/A that

5 "[t]he ForeCYTE Breast Health Test . . . involves collecting a specimen of nipple aspirate fluid,

6 or NAF, using our patented, FDA-cleared Mammary Aspirate Specimen Cytology Test, or

7 MASCT, System (***our MASCT System received 510(k) clearance from the FDA in 2003***)." *Id.*

8 at ¶¶ 6, 34. According to the CAC, Atossa materially altered the MASCT system such that it was

9 required to undergo additional FDA review and Section 510(k) qualification. When it failed to

10 contact the FDA to obtain additional review, the CAC alleges that Atossa misled investors

11 regarding FDA regulatory compliance. *Id.* at ¶ 7.

12      On February 25, 2013, Atossa disclosed that it had received a warning letter from the

13 FDA regarding the 510(k) clearance of the MASCT System and MASCT System Collection

14 Test. The letter also raised "certain issues with respect to the Company's marketing of the

15 System and the Company's compliance with FDA Good Manufacturing Practices (cGMP)

16 regulations among other matters." *Id.* at ¶ 8.

17      On release of this news, Atossa shares decreased $0.3869 per share to close at $6.54 per

18 share on February 25, 2013. *Id.* at ¶ 9.

19      Roughly seven months later, on October 4, 2013, Atossa issued the following press

20 release:

21          On October 4, 2013 Atossa Genetics Inc. (NASDAQ: ATOS) initiated a
            voluntary recall to remove the ForeCYTE Breast Health Test and the
22          Mammary Aspiration Specimen Cytology Test (MASCT) device from the
            market. This voluntary recall includes the MASCT System Kit and Patient
23          Sample Kit. The vast majority of these products (approximately ninety
            percent) are in inventory with Atossa's distributors and the remaining

24

1   quantities are at customer sites across the United States. Distributors and
2   customers should stop using affected products and return them to Atossa
    immediately.

3   Atossa is removing the ForeCYTE Breast Health Test and the MASCT
4   device from the market to address concerns raised by the U.S. Food and
    Drug Administration (FDA) in a warning letter received by Atossa in
5   February 2013. The FDA raised concerns about (1) the current instructions
    for use (IFU); (2) certain promotional claims used to market these devices;
    and (3) the need for FDA clearance for certain changes made to the Nipple
6   Aspirate Fluid (NAF) specimen collection process identified in the current
7   IFU. Atossa will remove existing product from the market until FDA's
    concerns are addressed.

8       Following the announcement, Atossa stock declined $2.47 per share, more than 46%, to

9   close at $2.85 per share on October 7, 2013.

10  ### III. DISCUSSION

11  **A. Governing Law**

12      Under the Private Securities Litigation Reform Act ("PSLRA"), private plaintiffs have

13  twenty days from the filing of a class action securities complaint to publish a notice advising

14  putative class members of the pendency of the action, the claims asserted, the purported class

15  period, and the right of any class member to move the court to serve as lead plaintiff. 15 U.S.C. §

16  78u-4(a)(3)(A)(i). Class members have sixty days from the date of publication to move the court

17  for appointment as lead plaintiff. *Id.* The court then considers any motion to serve as lead

18  plaintiff made by a putative class member. 15 U.S.C. § 78u-4(a)(3)(B)(i). The court appoints a

19  lead plaintiff that is "most capable of adequately representing the interests of class members." *Id.*

20      Under the PSLRA, a plaintiff is presumptively adequate to serve as lead plaintiff if she

21  (1) either filed the complaint or moved to serve as lead plaintiff, (2) has the largest financial

22  interest in the relief sought by the class, and (3) otherwise satisfies Fed. R. Civ. P. 23. 15 U.S.C.

23  § 78u-4(a)(3)(B)(iii).  The presumption may be rebutted if another member proves that the

24

1  presumptively adequate plaintiff will not fairly and adequately represent the class or is subject to

2  unique defenses. *Id.*

3      District courts must first identify the financial interests of the movants seeking to serve as

4  lead plaintiffs to determine which has the greatest financial stake in the controversy. *In re*

5  *Cavanaugh*, 306 F.3d 726, 730 (9th Cir. 2002). After selecting the plaintiff with the greatest

6  financial interest, the court looks to that plaintiff's declarations and pleadings to determine

7  whether the movant satisfies Rule 23(a). *Id.* If the movant is both "adequate" and "typical" as

8  contemplated by Rule 23(a), the movant becomes the presumptively adequate lead plaintiff.

9  After the presumptive lead plaintiff is identified, the court reviews evidence presented by other

10  plaintiffs to rebut the presumption of lead plaintiff status. *Id.* If the evidence presented casts

11  sufficient doubt on the adequacy and typicality of the presumptive lead plaintiff, the court looks

12  to the movant with the second greatest financial interest and repeats the process. *Id.* at 731.

13  **B.  Analysis**

14      First, the Court finds that this class action was properly noticed and that each motion to

15  appoint lead plaintiff was timely filed under the time restraints imposed by the PLSRA. Next, the

16  Court turns to the merits of the Levi Group and Mr. Dam's competing motions. As Mr.

17  Chobanian has moved to withdraw his pending motion for appointment as lead plaintiff, that

18  motion will not be considered and shall be stricken as moot.

19      1.  <u>Movant with the Greatest Financial Interest</u>

20      There is no prescribed method for calculating a party's financial stake in the case. *Id.* at

21  730 n.4.  However, courts "must compare the financial stakes of the various plaintiffs and

22  determine which has the most to gain from the lawsuit," through "accounting methods that are

23  both rationally and consistently applied." *Id.* at 730. Courts often consider the following four

24  factors to determine which plaintiff has the largest financial interest: (1) total shares purchased,

(2) net shares purchased, (3) net funds expended, and (4) approximate loss suffered. *Frias v. Dendreon Corp.*, 835 F. Supp. 2d 1067, 1075 (W.D. Wash. 2011); *see also In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998).

Here, the following chart identifies the financial interests of the individual members of the Levi Group, the total financial interest of the Levi Group, and the financial interests of Mr. Dam.

| Movant | Shares Purchased | Amount Expended | Retained Shares | Estimated Loss |
|---|---|---|---|---|
| Harrison | 30,000 | ($153,898) | 30,000 | ($89,512) |
| Almosa | 10,000 | ($73,000) | 10,000 | ($51,538) |
| Levi | 10,000 | ($60,018) | 10,000 | ($38,674) |
| **Levi Group** | **50,000** | **($286,916)** | **50,000** | **($179,724)** |
| **Dam** | **31,200** | **($219,202)** | **28,000** | **($107,240)** |

Dkt. # 18, p. 3 (modified). The chart demonstrates that the Levi Group purchased the highest number of total shares, retained the highest number of shares, expended the largest number of funds, and suffered the largest estimated loss during the class period. As the Levi Group best satisfies each factor, it has the largest financial interest in this action.

2.   Rule 23 Adequacy and Typicality

Having found that the Levi Group has the greatest financial interest, the Court next considers whether it meets the requirements of Rule 23. On a motion to serve as lead plaintiff, the Rule 23 inquiry depends on satisfaction of the "typicality" and "adequacy" aspects of the rule. *Frias*, 835 F. Supp. 2d at 1075. "At the lead plaintiff stage of the litigation, in contrast to the class certification stage, a proposed lead plaintiff need only make a preliminary showing that it will satisfy the typicality and adequacy requirements of Rule 23." *Sgalambo v. McKenzie*, 268 F.R.D. 170, 173 (S.D.N.Y. 2010) (internal quotations and citation omitted).  Typical claims are those that (1) arise from the same event or course of conduct giving rise to the claims of other

1   class members and (2) are brought under the same legal theory. *Frias*, 835 F. Supp. 2d at 1075.

2   "Adequacy" requires (1) that the presumptive lead plaintiff's interests align with the class's

3   interests, and (2) that the presumptive lead plaintiff's selected counsel are "qualified,

4   experienced, and generally able to conduct the litigation." *Id.* at 1076 (quoting *Schonfield v.*

5   *Dendreon Corp.*, Case No. C07-800-MJP, 2007 WL 2916533, at * 4 (W.D. Wash. Oct. 4,

6   2007)).

7         Upon review of the Levi Group's moving papers, the group makes a preliminary showing

8   that it meets the typicality and adequacy requirements. The Levi Group, like other putative class

9   members, purchased shares of Atossa stock during the class period at allegedly inflated prices,

10  and it sustained losses when Defendants' alleged misrepresentations were exposed. Therefore, its

11  claims are typical of the class because they arise from Atossa's conduct during the class period

12  and are brought under the same legal theory.

13        The Levi Group also meets the adequacy requirement because (1) its interests presumably

14  align with the class and (2) it has selected qualified and competent class counsel. First, the Levi

15  Group seeks to hold Atossa liable for the damages sustained by class members. Each member of

16  the Levi Group has certified his intent to serve as a willing class representative and submitted a

17  schedule detailing his transactions during the class period. Dkt. # 8, Leviton Decl., Ex. B.

18  Second, the PSLRA requires that the proposed lead plaintiff select and retain class counsel,

19  subject to the court's approval. 15 U.S.C. § 78u-4(a)(3)(B)(v); 15 U.S.C. § 77z-4(a)(3)(B)(v). By

20  statute, that approval should not be withheld unless necessary "to protect the interests of the

21  class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa). Here, the requested lead law firms of Block &

22  Leviton, and Pomerantz, have significant experience in securities litigation. *See id.*, Leviton

23  Decl., Ex. D-E. In addition, requested liaison counsel, Zwerling Schacter, has extensive

24

1    securities litigation experience in this District and around the country. *See id.*, Leviton Decl., Ex.

2    F. Thus, the Levi Group has made a *prima facie* showing for the Rule 23 requirements.

3        3.   Mr. Dam's Opposition to the Levi Group's Appointment

4            Mr. Dam contends (1) that the Levi Group lacks standing to bring the 1933 Act claims

5    and is therefore subject to a unique defense (2) that the Levi Group is a lawyer-driven

6    aggregation of unrelated individual investors, which violates the PLSRA; and (3) that appointing

7    the Levi Group's choice of co-lead counsel would be improper. Taking the standing argument

8    first, Rule 23(b)(3) requires in part that, to maintain a class action, the court must find "that the

9    questions of law or fact common to class members predominate over any questions affecting

10   only individual members[.]" Fed. R. Civ. P. 23(b). Although 1933 Act standing is usually

11   considered on a predominance or Rule 23(b)(3) challenge, Dam contends that a lack of standing

12   would subject the members of the Levi Group to a unique defense rendering it an atypical lead

13   plaintiff.

14           Section 11 of the 1933 Act provides a cause of action to any person who buys a security

15   issued under a materially false or misleading registration statement. 15 U.S.C. § 77k. Although

16   plaintiffs are not required to have purchased their shares from the shares offered under the

17   misleading registration statement, they must, to maintain standing, be able to trace the purchase

18   of those shares back to the relevant offering. *See Hertzberg v. Dignity Partners, Inc.*, 191 F.3d

19   1076, 1080 (9th Cir. 1999). Mr. Dam points out that besides the shares offered under Atossa's

20   IPO and associated registration statement, there were approximately 10.6 million pre-IPO shares

21   that became "unrestricted," or available for trading, on May 7, 2013. *See* Dkt. # 22, Cantor Supp.

22   Decl., Ex. 2. Mr. Dam argues that because all members of the Levi Group purchased their shares

23   after May 7, 2013, they may not be able to prove that their purchased shares can be traced back

24

1   to the allegedly misleading registration statement. Thus, Mr. Dam contends, the Levi Group may

2   not have standing to pursue the 1933 Act claims on behalf of the class.

3         Importantly, Mr. Dam has provided no evidence that any of the pre-IPO shares that could

4   have been traded after May 7, 2013 actually entered the market.  He raises the specter of a post-

5   lock up influx by referencing Atossa's daily trading information from May 1, 2013 through May

6   15, 2013, which he downloaded from the Yahoo!Finance website.[1] The information indeed

7   shows an increase in trading activity after May 6, 2013. When the search is expanded to include

8   dates prior to May 2013, however, there is also a significant trading increase in March 2013, well

9   before Dam contends that any pre-IPO shares could have entered the market.[2] Thus, Dam's

10  contention that "[a] significant portion of those 10.6 million pre-IPO shares were likely placed

11  on the market . . . given the quite dramatic increase in trading volume" (Dkt. # 24, p. 5) is

12  entirely speculative as Atossa share trading volume appears to have similarly fluctuated before

13  the lock-up's expiration. Such speculation is insufficient to rebut the presumption that the Levi

14  Group satisfies the adequacy and typicality requirements. *See Cavanaugh*, 306 F.3d at 729; *see*

15  *also In re Molycorp., Inc. Sec. Litig.*, Case No. 12-cv-0292-WJM-KMT, 2012 U.S. Dist. LEXIS

16  89191, at *6 (D. Colo. May 29, 2012) ("speculation that a movant may be either atypical or

17  inadequate will not defeat the PLSRA's most adequate plaintiff presumption").

18        With respect to Dam's second challenge—that the Levi Group improperly aggregated

19  unrelated investors—the Court finds the argument unpersuasive. "[T]here is no question that a

20

21  _____

22        [1] *See* Yahoo!Finance,
    http://finance.yahoo.com/q/hp?s=ATOS&a=04&b=1&c=2013&d=04&e=15&f=2013&g=d (last
    visited Feb. 13, 2014).

23        [2] *See id.*,
    http://finance.yahoo.com/q/hp?s=ATOS&a=00&b=1&c=2013&d=07&e=15&f=2013&g=d&z=6

24  6&y=66 (last visited Feb. 13, 2014).

ORDER ON MOTIONS TO APPOINT LEAD PLAINTIFF - 9

group of investors can serve as 'lead plaintiff' . . . ." *Frias*, 835 F. Supp. 2d at 1072. Further,

many courts have found that plaintiffs need not have had a pre-existing relationship to properly

aggregate loss to demonstrate the largest financial interest. *See e.g.*, *Sabbagh v. Cell*

*Therapeutics, Inc.*, Case No. C10-559-MJP, 2010 WL 3064427, at *4 (W.D. Wash. Aug. 2,

2010) ("[t]he trend in recent years, however, seems to be away from a blanket prohibition against

'lead plaintiff groups' with no pre-existing relationship"). While the PLSRA aims to discourage

lawyer-driven litigation, courts have recognized that "a pre-existing relationship between

[investors] that comprise a group is not required if the resulting group is small and cohesive

enough such that it can adequately control and oversee the litigation." *Eichenholz v. Veriphone*

*Holdings, Inc.*, Case No. C07-06140 MHP, 2008 WL 3925289, at *8 (N.D. Cal. Aug. 22, 2008);

*see also In re Molycorp*, 2012 U.S. Dist. LEXIS 89191 at *6 (collecting cases).

   In *Shonfield*, this Court observed that plaintiff groups with no pre-litigation connection

vying for lead plaintiff status should provide the court with declarations detailing the member's

background, and the group's intended structure and mechanism for functioning. 2007 U.S. Dist.

LEXIS 76816 at *6.

> Such information should include descriptions of its members, including
> any pre-existing relationships among them; an explanation of how it was
> formed and how its members would function collectively; and a
> description of the mechanism that its members and the proposed lead
> counsel have established to communicate with one another about the
> litigation. If the proposed group fails to explain and justify its composition
> and structure to the court's satisfaction, its motion should be denied or
> modified as the court sees fit.

*Id.* at *6-7 (quoting *In re Networks Assocs., Inc., Sec. Litig.*, 76 F. Supp. 2d 1017, 1026 (N.D.

Cal. 1999)).

   Here, although Levi Group includes three individual investors who lack a pre-existing

relationship, it has filed declarations attesting to the following: (1) that each member is a

sophisticated investor who is knowledgeable about SEC disclosure rules and SOX disclosure requirements; (2) that they will jointly work as "a small, cohesive, manageable group"; (3) that each member will supervise counsel and make important litigation decisions; and (4) that each member has agreed upon how they will make decisions, and have selected Mr. Harrison to act as the group's spokesperson and as liaison with counsel and the Court. *See* Dkt. ## 19–19-3, Leviton Decl. Upon review of the declarations, the Court finds that the Levi Group is a small, cohesive group that will endeavor to act in the best interests of the putative class members and manage the course of future litigation.

Finally, as to whether the Levi Group's request to approve two law firms as co-lead counsel is improper, Dam has failed to submit evidence that would tend to show impropriety. Dam refers the Court to the two declarations filed by Mr. Almosa to suggest possible impropriety of the Group's selection of counsel. In Mr. Almosa's first certification, he stated that he had retained the Rosen Law Firm P.A. to represent him in this action. Dkt. # 8-2, p. 5. In the second declaration, Mr. Almosa supported the joint appointment of Block & Leviton and Pomerantz. Dkt. # 19-3, p. 2. Although clearly inconsistent, the certification and declaration alone do not raise an issue as to whether Block & Leviton and Pomerantz can work together in the best interest of the class. Nor does this inconsistency demonstrate impropriety in the Group's selection of counsel. Notably, Dam does not challenge the competence, experience, and resources of the selected law firms to litigate this action. Thus, the Court finds that Mr. Dam has failed to rebut the presumption of adequacy and typicality of the Levi Group. Accordingly, the Levi Group shall be appointed Lead Plaintiff and the law firms of Block & Leviton and Pomerantz shall be appointed co-Lead Counsel. The law firm of Zwerling Schacter shall be appointed Liaison Counsel.

**IV. CONCLUSION**

Having reviewed the motions, the responses and replies thereto, the declarations and attached exhibits, and the remainder of the record, the Court hereby finds and ORDERS:

(1) The Levi Group's Motion to Appoint Lead Plaintiff and Approve Lead Counsel (Dkt. # 7) is GRANTED;

(2) Mr. Dam's Motion to Appoint Lead Plaintiff (Dkt. # 9) is DENIED;

(3) Mr. Chobanian's Motion to Withdraw (Dkt. # 20) is GRANTED and his Motion to Appoint Lead Plaintiff (Dkt. # 3) is STRICKEN AS MOOT.

The Court further ORDERS as follows:

1.      The Court hereby appoints Movants as Lead Plaintiffs for the class (the "Class") of purchasers of Atossa Genetics, Inc. common stock during the period between November 8, 2012 and October 4, 2013, inclusive (the "Class Period").   Movants satisfy all of the requirements for lead plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

2.      Pursuant to the PLSRA, Movants have selected and retained the law firms of Block & Leviton LLP ("Block & Leviton") and Pomerantz Grossman Hufford Dahlstrom & Gross LLP ("Pomerantz") as Co-Lead Counsel in this action.   The Court approves the selection of Block & Leviton and Pomerantz as Co-Lead Counsel for the putative Class.

3.      Co-Lead Counsel for the Class shall have the following responsibilities and duties, to be carried out either personally or through counsel whom Co-Lead Counsel shall designate:

(a)      the briefing and argument of motions;

1     (b) the conduct of discovery proceedings;

2     (c) the examination of witnesses in depositions;

3     (d) the selection of counsel to act as spokesperson at pretrial conferences;

4     (e) to call meetings of the plaintiffs' counsel as they deem necessary and

5 appropriate from time to time;

6     (f) to conduct all settlement negotiations with counsel for defendants;

7     (g) to conduct or direct the pretrial discovery proceedings and the preparation

8 for trial of this matter and to delegate work responsibilities to selected counsel as may be

9 required; and

10     (h) to supervise any other matters concerning the prosecution, resolution or

11 settlement of this action.

12   4. No motion, request for discovery, or other pretrial proceedings shall be initiated

13 or filed by any plaintiff in the Class without the approval of Co-Lead Counsel, so as to prevent

14 duplicative pleadings or discovery by plaintiffs.  No settlement negotiations shall be conducted

15 without the approval of Co-Lead Counsel.

16   5. Co-Lead Counsel shall have the responsibility of receiving and disseminating

17 Court orders and notices, other than as may be served through this Court's ECF System.

18   6. Co-Lead Counsel shall be the contact between plaintiffs' counsel and defendants'

19 counsel, as well as the spokesperson for plaintiffs' counsel, and shall direct and coordinate the

20 activities of plaintiffs' counsel.

21   7. Other than as served through the Court's ECF System, defendants shall effect

22 service of papers on plaintiffs by serving a copy of same on lead counsel by overnight mail

23 service, e-mail or hand delivery.  Co-Lead Counsel shall serve copies of such papers on any

24

1   other plaintiffs' counsel by e-mail or first-class mail.  Co-Lead Counsel shall effect service of

2   papers on defendants by serving a copy on defendants' counsel by overnight mail service, e-mail,

3   or hand delivery.

4      8.   During the pendency of this litigation, or until further order of this Court, the

5   parties shall take reasonable steps to preserve all documents within their possession, custody, or

6   control, including computer-generated and stored information, and materials such as

7   computerized data and electronic mail, containing information which is relevant to the subject

8   matter of the pending litigation.

9      9.   The caption of this case shall be amended to read: *In re Atossa Genetics, Inc.*

10  *Securities Litigation* and each future pleading shall bear this caption.

11     10.  The Court hereby orders that Lead Plaintiffs are permitted to file an amended

12  class action complaint within 60 days from the date of this Order.

13

14     Dated this 14th day of February 2014.

15

16                                      RICARDO S. MARTINEZ

17                                      UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24